Good morning. May it please the Court, my name is David Schlesinger. I represent the appellant Robert Cota, Jr. With the Court's indulgence, I'd like to focus predominantly today on the one sub-issue that permeates all three of the issues that we've raised in our briefs, and that is the government's omitting to disclose Mr. Cota's Fourth Amendment waiver, and the Fourth Amendment waiver of his then live-in girlfriend, Susan Zimmerman. Now, in a nutshell, as the Court can tell from having reviewed the excerpts of record, and in particular the sealed affidavits that we submitted in Volume 5 of the excerpts of record, the government did not spare many investigatory expenses or resources in the course of conducting this investigation into international methamphetamine trafficking from Mexico into the United States. So it is particularly surprising in light of that that one of the easier facts and one of the more important facts that the government should have included in those affidavits, and I'm specifically referring to the July 7, 2011, supporting affidavit from Special Agent Jeffrey Grimming, what Mr. Grimming, what Agent Grimming should have included in that affidavit, and he did with regard to other targets, is that Mr. Cota and Ms. Zimmerman had Fourth Amendment waivers, which would have allowed the government at any time via probation authority in the state of California to conduct unannounced warrantless searches of Mr. Cota's residence and his possessions as well. So why is that material, given that the affidavit did say that physical searches would have been counterproductive? Well, Your Honor, the language regarding physical searches was either very broad or general, too nonspecific under this Court's case law in Blackman and Gonzalez, Incorporated. And to the extent that it did discuss Fourth Amendment searches regarding Julie Peterson, who is purportedly Mr. Cota's principal supplier of methamphetamine, and another target named Garcia, Special Agent Grimming disclosed that Fourth Amendment searches would not have been fruitful because there was no knowledge that those two individuals actually had spent any time at the residence that the government would have liked to search. So regarding Mr. Cota, as the investigation bore out and as the evidence – But it also says a search of Garcia's residence would be premature and is more likely to have a chilling effect on Peterson and Garcia. Again, those are facts specific to those two individuals. The government should have disclosed why for Cota and for Zimmerman that that would have been applicable as well. Blackman has made it clear that facts – Just to follow up on that, Judge Friedland, I'm still not clear why – let's say the government had disclosed the suspicionless search condition. What difference would that have made to the district judge? Well – Why would that necessarily be a bar to signing the warrant? It's a fact that would have shown, Your Honor, that traditional investigative techniques were still available and could have been conducted without needing to – But wasn't the point of the warrant to look at the conspiracy as a whole? It wasn't just to arrest Mr. Cota. I mean, the point of the warrant was to get to the whole drug smuggling, drug conspiracy operation. And we acknowledge, Your Honor, that there was a sweeping conspiracy the government was looking to investigate. But as Blackman – cases such as Blackman and Gonzales Incorporated emphasize, the full and complete disclosure, full and complete statement, and the necessity requirement of 25183C need to be satisfied with regard to each target, not regard to the investigation as a whole. Are you saying a wiretap can't be issued when one of the potential targets has a suspicionless search condition? No, I'm not saying categorically, Your Honor, that it cannot be issued. I think under the facts of this case, particularly given that the government's investigatory techniques were yielding probative evidence regarding Mr. Cota's purported involvement in this conspiracy. Is there any question that the district court would have understood that a search warrant for the home would have been possible? I mean, I'm not even sure why it matters that they could have had a warrantless one when they presumably could have gotten a warrant. The point of these affidavits was that they needed a – they thought they needed a wiretap. But Special Agent Grimming, Your Honor, had disclosed generally in his affidavits that the government was always going to be looking for opportunities to conduct pretextual searches of this sort. So much like with the stop and seizure of Mr. Cota's vehicle on the evening of July 25, 2011, which was done on a pretextual basis, the goal for the – for doing the – or I should say the underlying rationale for doing the pretextual search would have been to make sure that Mr. Cota and Ms. Zimmer were not aware that they were part of some type of broader international drug conspiracy investigation. And so by having a parole officer conduct – probation officer conduct the search as opposed to someone involved with the federal law enforcement, that would not have tipped them off. And how would the physical search have told them about other conspirators? Well, it very easily could have disclosed pay-o sheets, much like the ones that were seized from Julie Peterson at the U.S.-Mexico border. It certainly could have disclosed other documents that linked other people to the conspiracy. And certainly it would have – You're putting a lot of stock into the idea that criminal conspiracies keep good written records. I mean, a lot of this is intentionally designed not to have good written records. That's why the wiretaps are necessary. And we acknowledge that, Your Honor, but in this case, as I just mentioned, the government did – from conducting a border search of Ms. Peterson, it was able to get copies of her pay-o sheets, and those ended up being admitted in evidence in this trial. So Your Honor is correct that sometimes the documentation might not be as pristine as they would necessarily be in a conventional business context. But given the searches that did happen in this case, particularly regarding Mr. Cota's Fig Avenue residence in Chula Vista, his Marquardt Court residence in San Diego, his purported stash house, and his marijuana grow operation in a warehouse in Chula Vista, there was quite a bit discovered through actual searches conducted pursuant to warrants. So it shows that at any time an unannounced warrantless search very easily could have yielded the 50 grams or more of methamphetamine that is the triggering amount for a sentencing. What do you think your best case is for the proposition that the suspicionless search condition should have been disclosed to the judge reviewing the wiretap application?  Your Honor, I would like to reserve some time for rebuttal. But before doing so, we'll answer your question. I think the best cases in this area generally are Blackman and Gonzalez Incorporated regarding the need to make specific disclosures of material facts that concern whether conventional investigative techniques would be effective in yielding probative evidence. Now, I might be wrong, so you should tell me, but I don't think either of those cases directly address the suspicionless search condition. But they don't specifically deal with Fourth Amendment waivers, Your Honor. And we did distinguish this Court's recent opinion in United States v. Rodriguez, which did deal with a Fourth Amendment waiver issue, and we've distinguished that because that case dealt with a Mexican mafia conspiracy investigation in which this Court held that, as Your Honor mentioned, in that particular instance, there was not any thought that there would be any documentation probative to the conspiracy. This, of course, is more of a garden-variety narcotics distribution conspiracy, one for which searches would be useful. One of my concerns is people who are the subject of wiretap applications often have prior convictions with search conditions. And you seem to be edging towards a bright-line rule that if for some reason the government doesn't disclose that, the application can't be approved. Yeah, Your Honor, I just want to be very clear. I'm not advocating a bright-line rule. I just am arguing that under the facts of this case, one of which the investigation was quite successful for the government as of June and July 2011, that the Fourth Amendment waiver is something that should have been disclosed on top of everything else. So in its totality, that should at the very least lead to a remand for a Franks hearing because that was, in our view, a reckless nondisclosure given how easy it would have been for Special Agent Grimming to have obtained that information. I'll still give you a minute for rebuttal afterwards. Thank you, Your Honor. I appreciate that. Good morning, Your Honors. May it please the Court, Mark Rahe for the United States. I think the panel may understand what our central argument is, and it is namely that there was no materiality to this search condition. At Excerpt of Record 1082, and this is from the July 7th affidavit, Agent Grimming expressly averred that they, even with extensive use of traditional investigative techniques, in conjunction with prior interceptions, we have yet to identify significant participants in the criminal activity, and it goes on, and this is the critical part, or a single location being used to store methamphetamine for more than very brief periods of time. And I think that in conjunction with Agent Grimming's averments about why searches in general were not being utilized satisfies our burden to show that there was no materiality. Even if the district judge had been aware of this search waiver, our contention is under Ippolito's one case, that was the initial one that applied Franks to wiretap affidavits, that no reasonable judge would have denied this wiretap affidavit or application on the basis of that alone. The storing of the meth wasn't really the issue so much as identifying the other people, right? Well, a little of both, Your Honor, exactly. And at that point, I mean, another thing to keep in mind is that in June of 2011, Mr. Cota, the defendant, wasn't even identified yet as a target. So by July of 2011, they're still, you're correct, still trying to find out the relationship of the people, but they are still also trying to find narcotics. And I believe even in the June 2011 affidavit, when Agent Grimming says that there have been no stash houses found so far, they were looking for it. I think there was discussion of somebody who had buried something in their backyard, but it didn't pan out. So I would only bring that up to indicate that it's not as if they were completely ignoring this tactic. These weren't just bare boilerplate assertions. And when they had prior interceptions, I mean, another point I want to make is that I know my opponent at one point said, well, when they finally did execute search warrants and there were three properties, the Fig Street residence, the Marquardt Court residence, and the Regal Street warehouse, they found a lot of evidence. But actually, I would disagree with that. This was a conspiracy to distribute methamphetamine. No methamphetamine was found in any one of those locations. Instead, there was a lot of marijuana. There was packaging material. So that, you know, and although that comes after the fact, I think it's still important to note, because on this record, this was not a historical investigation where warranted searches were turning up a lot of evidence. And, in fact, I know my opponent also said that even by July of 2011, the investigation had been quite successful. I mean, a couple points. As this Court is aware, and we cite the authority in our briefs, some success is not an impediment to a wiretap. I mean, it almost puts us between a rock and a hard place. If we don't have any success with traditional means, then we're accused of going to a wiretap too soon. Can I just jump in for one moment? So channeling my district judge colleagues for a moment, why didn't the agent just tell the judge looking at the application that there was a suspicionless search condition? I wish I knew the answer to that question. I'm not hiding anything from you. This was litigated five years ago for reasons unknown. It's not clear from the record. We just don't know. And as Mr. Schlesinger points out, at other points in the affidavit, when there were fourth waivers, the agent did refer to them. So I don't know, maybe you think that cuts both ways. I would tend to indicate it's when they're aware of it, they pointed it out. But in your view, there's no evidence the agent knew and chose not to do it. Correct. And I think our position below was I think the parties almost basically assumed there was never any dispute that it hadn't been disclosed. And so that was another reason why I don't think the denial of Frank's hearing was significant because parties basically assumed that that was the case. So the only question is materiality. And as this court knows from the Ippolito decision too, materiality is reviewed de novo. So this court can sit in the same position and make that finding. And again, Excerpt of Record 1082, when Agent Grimming says, we have yet to find a single location. We have yet to find the identity of major participants. And this was a conspiracy. I guess the last point I want to make is as this court's aware, I believe we cited cases McGuire, Rivera. It is well settled that the government is entitled to more leeway when they are investigating a conspiracy. And that's exactly what this was. I believe Judge Gould wrote the opinion in Rivera or McGuire with the colorful analogy that a conspiracy is like a hydra from Greek mythology. You can cut off one head, but then there's still others that can pick up. So when we look at this as far as the reasonableness, and again, the necessity as a whole is reviewed for abusive discretion. Based on the information here, this was a wide-ranging conspiracy. All these facts were detailed to the issuing judges. The government would submit that it can't be said that abusive discretion happened in this case. Are you arguing for a bright line rule that whenever you're investigating a conspiracy, you can get a wiretap? No, I'm not. Where is the line there, though? It seems like we could characterize both sides as to some extent arguing for a broad rule. Agreed. But I just know it's a point. McGuire is the one that comes to mind. It seems to be repeatedly cited in every one of the conspiracy cases. It's just something. It's almost a prism. It's not like deference, but you basically get more leeway when you're talking about a conspiracy, and that's exactly what was going on here. I mean, the fact that in June, when that first affidavit was applied, or at least Mr. Cota wasn't even identified, nor was Ms. Zimmerman. So this was definitely a dynamic investigation. Things were being learned, and those facts were disclosed as they were. So if it's not a bright line rule, what kind of conspiracy? What makes this case different from other conspiracies that might not justify a wiretap warrant? I honestly wouldn't know, Your Honor, but I would say the fact that this one, if this were a tiny one, I know the defense in their papers below tried to characterize it as just a local thing, but that's not true. It originated in September 2010 with controlled delivery, I believe, of 21 kilograms from Mexico. The sources of supply, Angel was the source of supply for Julie Peterson, indicated that there were two rival cartels. I mean, this wasn't just something that was happening on the streets of San Diego, and so I think that's a factor to take into consideration. Maybe in a hypothetical future case somewhere in the middle of Bakersfield, I don't know. Just drawing that where something is limited in geographical area might be a case, but here where you have it in an international component near the border, I would say this is a case where that kind of latitude should be extended. Unless the panel has any further questions, I would submit. Thank you, counsel. Thank you. Brief remaining time. I want to try to make a couple of points. First, Mr. Wray is correct that Mr. Cotto had not been identified as a target in this investigation as of July 2011, but he was otherwise on the government's investigatory radar, and indeed I believe it was in the July 2011 affidavit that Special Agent Grimming disclosed that the government did have wiretaps for Cotto that were used in other investigations, not in this specific one regarding this specific scheme. Also regarding Franks, I just wanted to emphasize to the court that we're not arguing at this stage that Special Agent Grimming intentionally withheld the information about the Fourth Amendment waivers. Of course, we only need to make a substantial showing that at a bare minimum there was recklessness in not disclosing the Fourth Amendment waivers in his affidavits, and we think that on this record. If he didn't know about it, what would show the recklessness? Recklessness would simply be just not following through on standard law enforcement investigatory techniques. How can that be reckless? That just sounds like negligence at most. I mean, recklessness has a higher mental state. You knew or should have known. Just failing to look at another page of the record can't be reckless. And we acknowledge that if those facts are correct, Your Honor, that more than likely would be negligence as opposed to recklessness, but that's why a hearing should be necessary to find out exactly what Special Agent Grimming did or did not do at that time, particularly given that he had correctly identified other suspects, other targets as having those waivers. I see that I'm over my time. If the Court does not have any further questions, be glad to submit. Thank you, both sides, for the helpful arguments. The case is submitted.
judges: Pregerson, Friedland, Donato